IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KEE SUNG KIM HAMBLIN,<br><br>Defendant. | CR 24-40-BLG-SPW<br><br>ORDER |

Before the Court is a Motion to Suppress filed by Defendant Kee Sung Kim Hamblin. (Doc. 29). Hamblin seeks to suppress the discovery of a firearm and any subsequent statements made to officers. (Doc. 30 at 2). Hamblin argues that the evidence seized was a result of an illegal *Terry* stop and should be suppressed as fruit of the poisonous tree. (*Id.*). Specifically, Hamblin argues that the officers lacked the necessary reasonable suspicion to satisfy Fourth Amendment standards. (*Id.* at 5).

The Government responded arguing that the Court should deny Hamblin's motion because officers had reasonable suspicion to seize Hamblin based on an anonymous tip coupled with law enforcement observations and experience. (Doc. 35 at 5).

1

The Court held a hearing on October 2, 2024, during which Billings Police Officer Tyler Bishop testified. The Court finds the material facts are not disputed based on the parties' briefing, Officer Bishop's testimony, and related video footage.

For the following reasons, the Court denies Hamblin's motion.

I.  **Factual Background**

At the suppression hearing, Officer Bishop testified that he was working the night shift in Billings, Montana, on December 5, 2023. At approximately 10:55 p.m., Officer Bishop was dispatched to Community Park based on a call to law enforcement reporting a male individual swinging a sword at trees and garbage cans. (Doc. 35 at 1; Doc. 30 at 2). Upon arrival to the park, Officer Bishop observed Hamblin at a picnic table "punching items," "appearing to be upset and violent." (Doc. 31). At the hearing, Officer Bishop testified that he shined his vehicle's spotlight at the picnic table to check for other people and other potential threats to law enforcement. (Doc. 32-C at 0:53–1:08). Upon seeing Hamblin that night, Officer Bishop testified that he suspected Hamblin was: (1) violating park hours; (2) engaging in disorderly conduct; or (3) experiencing a possible mental crisis.

After assessing the scene, Officer Bishop asked Hamblin to walk across the street toward the patrol car. (Doc. 35 at 2–3). Hamblin walked toward Officer Bishop, throwing a pair of shoes in the street as he walked. (Doc. 32-C at 1:21–1:40). According to Officer Bishop, Hamblin was compliant with Officer Bishop's

orders. As Hamblin moved closer, Officer Bishop observed a firearm on Hamblin's right hip. (Doc. 35 at 2; Doc. 30 at 3). Upon seeing the firearm, Officer Bishop ordered Hamblin to lay on the ground and place his hands on top of his head. (Doc. 35 at 3; Doc 30 at 3). Officer Bishop then placed Hamblin in handcuffs. (Doc. 31; Doc. 30 at 3). Officer Bishop removed the pistol from the holster on Hamblin's hip and gave it to another law enforcement officer on scene. (Doc. 31). Hamblin later told law enforcement officers he was practicing martial arts in the park. (Doc. 30 at 9; Doc. 35 at 3).

In 2023, Hamblin was convicted of felony criminal possession of dangerous drugs in Montana. (Doc. 27 at 3; Doc. 34 at 2). On March 21, 2024, Hamblin was charged with possession of a firearm or ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). (Doc. 2).

## II.   Legal Standard

A pretrial challenge to the introduction of evidence at trial is generally considered pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure. "In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, [the United States Supreme Court] conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search

and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914).

## III. Analysis

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment applies to all seizures of a person, including a brief detention short of a traditional arrest. *United States v. Birgnoni-Ponce*, 422 U.S. 873, 878 (1975). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to a personal security free from arbitrary interference by law officers." *Id.* On account of an investigative stop, the Fourth Amendment standard is satisfied when an "officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 234 U.S. 266, 273 (2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).

When reasonable suspicion is at issue, courts must look at the "totality of the circumstances of each case to see whether the [] officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 234 U.S. 266, 273 (2002) (internal quotations and citations omitted). The officer must have specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct.

4

*United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000). The reasonable suspicion standard is not a particularly high threshold to reach. "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

If law enforcement violates a defendant's Fourth Amendment right to be free from unreasonable searches and seizures, then, under the exclusionary rule, "all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

Here, Hamblin argues that law enforcement lacked reasonable suspicion because neither the anonymous caller nor the officers "[saw] Mr. Hamblin do anything illegal []or threatening." (Doc. 30 at 5). In response, the Government argues that four factors provided law enforcement with reasonable suspicion: (1) the report law enforcement received from a caller notifying them that "a man was in a public park, after its legal operation hours, swinging a sword like object;" (2) Officer Bishop's observation of Hamblin "behaving erratically and punching objects;" (3) Officer Bishop's speculation, based on his experience and training, that Hamblin

5

may be intoxicated or experiencing a mental health episode; and (4) Officer Bishop's observation of the firearm located on Hamblin's hip. (Doc. 35 at 5).

Under the totality of the circumstances, the Court finds that the anonymous call to law enforcement combined with Officer Bishop's observations and experience formed a sufficient basis for suspecting that Hamblin was engaged in criminal wrongdoing. The Court will address Hamblin's arguments in turn. First, his argument related to the anonymous caller and second, his argument related to Officer Bishop's observations and experience.

### A.   *Call to Law Enforcement*

First, Hamblin argues that the anonymous call reporting a man in the park swinging a sword and hitting trees could not form a basis of reasonable suspicion because the caller did not report illegal or threatening activity. (Doc. 30 at 8). The Government responds that the call is one factor supporting law enforcement's bases for establishing reasonable suspicion. (Doc. 35 at 5). Hamblin relies on several cases analyzing the reliability of a tip and its relationship to reasonable suspicion under the totality of the circumstances. (Doc. 30 at 8 (citing *Navarette v. California*, 572 U.S. 393, 397–98 (2014) ("an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop") (internal citations omitted); Doc. 30 at 10 (citing *Alabama v. White*, 494 U.S. 325, 327 (1990) ("corroboration of certain details made the anonymous tip sufficiently

reliable to create reasonable suspicion of criminal activity"); Doc. 30 at 11 (citing *Florida v. J.L.*, 529 U.S. 266 (2000) (an anonymous tip is not, by itself, sufficient to justify an investigative stop)).

Hamblin's reliance on the cited caselaw is misplaced. In *Navarette*, *White*, and *J.L.*, law enforcement primarily relied on an anonymous caller, without other indicia of suspicion, to perform the respective *Terry* stops. In *Navarette*, law enforcement stopped a vehicle based on a 911 caller reporting being run "off the roadway" by another vehicle. *Navarette*, 572 U.S. at 395. In *White*, law enforcement stopped a vehicle based on an anonymous telephone tip about a station wagon carrying drugs. *White*, 496 U.S. at 327. Finally, in *J.L.*, law enforcement stopped and frisked a young man based on an anonymous call reporting "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.*, 229 U.S. at 268. In *Navarette* and *White*, the Court upheld the constitutionality of the *Terry* stops because the "officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity." *Navarette*, 572 U.S. at 398, 404; *see also White*, 496 U.S. at 330–32. In *J.L.*, by contrast, the Court determined that "no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun." *Navarette*, 572 U.S. at 398; *J.L.*, 529 U.S. at 268.

Here, unlike law enforcement in *Navarette*, *White*, and *J.L.*, the Government offers additional factors separate from the phone call to form its basis for reasonable suspicion. The call is neither the primary nor the only indicia of suspicion forming the basis of the *Terry* stop. When Officer Bishop arrived at the park, he personally observed Hamblin's presence in the park after hours and he personally observed Hamblin's "erratic behavior" as reported by the caller. (Doc. 30 at 3). Thus, Hamblin may not reasonably rely on *Navarette*, *White*, or *J.L.* to dispute the *Terry* stop because the call is one of several factors for suspecting criminal wrongdoing and one of several factors under the totality of circumstances analysis.

### B.   *Officer Bishop's Observations and Experience*

Second, Hamblin argues that "[u]pon arriving at the scene, law enforcement failed to see [him] do anything illegal []or threatening." (Doc. 30 at 5). The Government argues that Officer Bishop did in fact see Hamblin acting erratically in the park after it closed for the evening. (Doc. 35 at 5–6). The Government concludes that Hamblin's presence in the park after closing time, his erratic behavior, and his probable violations of local and state codes gave rise to reasonable suspicion. (*Id.*).

In *Terry v. Ohio*, the officer observed the defendant (petitioner) and his associate repeatedly walk back and forth, look into a store window, and confer with one another. 392 U.S. at 6. Though the series of acts was "perhaps innocent in itself," the Court found that, taken together, they "warranted further investigation."

8

*Id.* at 22. Notably, the Court opined that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Id.* at 23.

In the suppression hearing, Officer Bishop testified that he has served on the Billings Police Department for over eleven years. Further, he testified that as a police officer he is familiar with both local and state law. Specifically, Officer Bishop testified to his familiarity with Billings City ordinance § 19-201 which states: "(a) City parks shall be open at 5:00 a.m. every day and close at 10:00 p.m. every day. No person shall remain in any city public park during the time when it is closed." Here, Officer Bishop received the dispatch call at 10:55 p.m., almost one hour after city park closing time. At minimum, Officer Bishop had reason to suspect that Hamblin was in violation of city ordinance § 19-201 based on his knowledge of city code.

Furthermore, Officer Bishop personally observed Hamblin punching a picnic table and "behaving erratically." (Doc. 35 at 5; Doc. 31). Under Montana state law:

> (1) A person commits the offense of disorderly conduct if the person knowingly disturbs the peace by:
>
>> (a) quarreling, challenging to fight, or fighting;
>> (b) making loud or unusual noises;
>> (c) using threatening, profane, or abusive language;
>> (d) rendering vehicular or pedestrian traffic impassable; [or]
>> (e) rendering the free ingress or egress to public or private places

9

>    impassable.

Mont. Code Ann. § 45-8-101(1)(a)–(e) (2023). Further, under Montana law:

> (1) A person commits the offense of criminal mischief if the person knowingly or purposely:
>
>   (a) injures, damages, or destroys any property of another or public property without consent; [or]
>   (b) without consent tampers with property of another or public property so as to endanger or interfere with persons or property or its use.

*Id.* § 45-6-101(1)(a)–(b). Officer Bishop's eleven years of experience coupled with his knowledge of state and local law gave him reason to suspect upon arriving at the park that Hamblin was engaged in illegal conduct—namely, remaining in a city park after hours, disorderly conduct, or criminal mischief. Like the officer in *Terry*, it would have been poor police work if Officer Bishop had not investigated, given his tenured experience as a Billings police officer, his knowledge of local and state law, and his observations of Hamblin's behavior in the park. Though Officer Bishop did not cite Hamblin for state or city code violations, Officer Bishop had an objective and particularized suspicion that Hamblin was engaged in "legal wrongdoing." *Arvizu*, 234 U.S. at 273.

In light of the totality of circumstances, giving due weight to Officer Bishop's experience and his reasonable deductions as the evening progressed, this Court finds that law enforcement had a reasonable, particularized basis for suspecting Hamblin was violating local or state law— at minimum, Billings city ordinance § 19-201.

## IV. Conclusion

Under the totality of circumstances, this Court finds that the anonymous call to law enforcement combined with Officer Bishop's personal observations and experience constitute sufficient basis to form reasonable suspicion which ripened into a *Terry* stop.

IT IS SO ORDERED that Defendant Kee Sung Kim Hamblin's Motion to Suppress (Doc. 29) for lack of reasonable suspicion to support a *Terry* stop is DENIED.

DATED this 18th day of October, 2024.

_____
SUSAN P. WATTERS

United States District Judge